UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

IN THE MATTER OF THE SEARCH OF
FOUR CELLULAR PHONES IN THE          Case No. 3:22MJ_____
CUSTODY OF FBI NEW HAVEN

## AFFIDAVIT

I, Tae H. Kim, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AFFIANT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since March 2020. Prior to working for the FBI, I was employed by the Gwinnett County

Police Department from November 2014 to February 2020. At the police department, I took on

duties as a patrol officer as well as an investigator with the Detective Bureau. I am presently

assigned to the FBI's Safe Streets Task Force in New Haven. The FBI is the lead agency in that

Task Force, which comprises federal, state, and local law enforcement personnel, and which is

tasked with investigation of violent crime in the City of New Haven and surrounding

communities. As such, my duties include, among other things, investigating violations of Title

18 and Title 21 of the United States Code, such as narcotics trafficking offenses and violent

crimes. During my experience in law enforcement, I have participated in investigations of

diverse crimes, including but not limited to: Illegal distribution of controlled substances, property

crimes, and violent crimes. In connection with these investigations, I have executed numerous

search and arrest warrants, including arrest warrants for narcotics trafficking offenses and search

warrants for social media accounts, cellular devices, and physical premises such as residences.

2.      I am an investigative or law enforcement officer of the United States within the

meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations and to

make arrests for offenses enumerated in 18 U.S.C. § 2516. I am also a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

4.      This affidavit is submitted in support of an application for warrants to search the following cellular devices (collectively, the "Target Cell Phones"), which are further described in Attachments A-1—A-4, and which are in the custody of FBI New Haven and are believed to have been used by Luis SALAMAN Sr., a.k.a. "Bebe," in connection with drug trafficking offenses, as described herein. Each of the target devices was seized during the execution of a search warrant at SALAMAN's residence of 34 Houston Street, Floor 2, New Haven, Connecticut:

a.  A black Samsung model A32 cellular device assigned call number 203-887-4311 and assigned International Mobile Equipment Identity (IMEI) 355820494158936 ("**Target Cell Phone 3**");

b.  A blue and black Motorola model XT2093DL cellular device with IMEI 355568113859380 ("**Target Cell Phone 4**");

c.  A black Samsung model A12 cellular device assigned IMEI 357486356039123 ("**Target Cell Phone 5**"); and

d.  A blue and black Motorola model XT2093-3 cellular device IMEI 351647114380721 ("**Target Cell Phone 6**").[1]

---

[1] On April 1, 2022, United States Magistrate Judge Robert M. Spector signed warrants authorizing the searches of Target Cell Phones 1 and 2, as further described in the affidavit supporting those applications, which is incorporated by reference. Case No. 3:22MJ382 (RMS).

5.     The proposed warrants would authorize the forensic examination of these devices for the purpose of identifying electronically stored information particularly described herein and in Attachments B-1—B-4.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that SALAMAN and Ismael HEREDIA, a.k.a. "Junie," have violated 21 U.S.C. § 841 (Possession with the Intent to Distribute and Distribution of Narcotics), 21 U.S.C. § 846 (Conspiracy to Distribute and to Possess with the Intent to Distribute Narcotics), and 21 U.S.C. § 843 (Use of a Telephone to Facilitate a Narcotics Trafficking Offense) (the "Target Offenses") and that the devices set forth above will contain evidence of those violations.

## PROBABLE CAUSE

7.     As discussed herein, an investigation by the FBI has shown that SALAMAN and HEREDIA were, until their arrests on April 5, 2022, distributors of large quantities of heroin and fentanyl in the New Haven area.

### Background of the Investigation

8.     On or about October 5, 2021, a cooperating source ("CS-1") informed FBI New Haven that SALAMAN was distributing large quantities of narcotics throughout New Haven, Connecticut. CS-1 also provided Target Cell Phone 1 as a phone number for SALAMAN. CS-1 is cooperating with the FBI in the hope of receiving consideration at sentencing in a pending matter in which CS-1 has pleaded guilty to committing a number of larcenies. CS-1 also has multiple prior convictions, including convictions for larceny and burglary. The FBI has also provided CS-1 with financial assistance to cover living expenses during CS-1's cooperation, as well as relocation assistance. As of this date, CS-1 has conducted multiple controlled drug buys orchestrated and supervised by the FBI and has also provided the FBI with information that has been corroborated by independent means. To my knowledge, CS-1 has not knowingly provided

any false information while working with the FBI or any other law enforcement. I find CS-1 to be reliable for these reasons.

9.       A second cooperating source ("**CS-2**") has also been involved in the investigation into SALAMAN and HEREDIA. CS-2 has been working with the FBI mainly for monetary compensation. CS-2 has conducted multiple controlled drug buys orchestrated and supervised by the FBI in the past and has also provided the FBI with information that has been corroborated by independent means. To my knowledge, CS-2 has not knowingly provided any false information while working with the FBI or any other law enforcement. I find CS-2 to be reliable for these reasons.

10.      Male pronouns are used for the cooperating sources regardless of the source's actual gender.

## November 16, 2021 Controlled Narcotics Buy

11.      On or about November 16, 2021, Special Agent Kim, Special Agent Daniel Veale, and CS-1 met at a pre-determined location. At the direction of Special Agent Kim, CS-1 called SALAMAN at Target Cell Phone 1.[2] SALAMAN instructed CS-1 to meet at the intersection of Fillmore Street and Clay Street in New Haven, Connecticut to purchase of 50 grams of heroin. During the call to SALAMAN, neither CS-1 nor SALAMAN mentioned heroin; however, based on their respective reputations, CS-1 understood, and believed that SALAMAN understood, that the product to be bought and sold would be heroin with fentanyl compound. The call was recorded, and Special Agent Kim visually observed CS-1 place the call. Special Agent Kim later confirmed that CS-1 had made the call by looking and taking a photograph of CS-1's

---

[2] As noted above, Target Cell Phone 1 was the subject of a prior search warrant issued April 1, 2022, by Judge Spector.

phone call log. During the call, SALAMAN advised CS-1 that he was ready to conduct the transaction.

12.     Special Agent Kim outfitted CS-1 with a recording equipment and provided CS-1 with government funds to complete the purchase. CS-1, followed by surveillance units, drove to the location provided by SALAMAN. Based on the review of the audio/video recording from CS-1's recording device, Special Agent Kim observed CS-1 meet with SALAMAN who arrived in a red Jeep Wrangler with Connecticut registration BB50721. SALAMAN was identified by CS-1 after the transaction based on CS-1's history with SALAMAN and by a member of the FBI Safe Streets Task Force who had dealt with SALAMAN in prior investigations. A database check of the Connecticut registration BB50721 also returned to a Luis Angel Salaman (DOB: xx/xx/1982). SALAMAN told CS-1 that he needed about 45 minutes to an hour to go see his "plug" in Bridgeport, Connecticut to collect more product. SALAMAN told CS-1 that the price for the product would be $2,750 for 50 grams. CS-1 left the agents until further information was available.

13.     Approximately two hours later, CS-1 received a phone call from SALAMAN using Target Cell Phone 1 regarding another meet at the same location. Members of FBI New Haven Safe Streets Task Force and CS-1 met at a pre-determined location. At the direction of Special Agent Kim, CS-1 called SALAMAN at Target Cell Phone 1 to confirm the purchase of 50 grams of heroin. The call was recorded, and Special Agent Kim visually observed CS-1 place the call.

14.     Special Agent Kim outfitted CS-1 with a recording equipment and provided CS-1 with government funds to complete the purchase. CS-1, followed by surveillance units, drove to the location provided by SALAMAN. Based on the review of the audio/video recording from

CS-1's recording device, Special Agent Kim observed the following: At the meet location, SALAMAN was standing outside with two other then-unknown males. SALAMAN was wearing a distinctive blue flat brimmed hat with white numbers "76" written in white, surrounded by white stars (the logo for the Philadelphia 76ers basketball team). SALAMAN was also wearing a black jacket with a Tommy Hilfiger logo displayed on the left breast area of the jacket. SALAMAN's jacket had a zipper with a tag that displayed "HILFIGER" in white lettering along with navy blue, white, and red stripes going vertical in-line with the zipper. The black jacket also displayed the same navy blue, white, and red colors near the right pocket. SALAMAN was also wearing black pants, blue shoes with white stripes, and black sunglasses with gold circular emblems on both hinges. SALAMAN told CS-1 to go with one of the males who identified himself as "Junie."

15.     "Junie" was later identified as HEREDIA, as discussed below.

16.     HEREDIA got into the driver's side of a parked white sedan and CS-1 got into the passenger side of the same vehicle. HEREDIA provided CS-1 his phone number (Target Cell Phone 2)[3] and told CS-1 that if CS-1 wanted more product in the future, CS-1 could get it from him for $55 per gram if it is more than 100 grams, or $60 per gram if the request was for less than 100 grams. CS-1 handed HEREDIA $2,750 and HEREDIA handed CS-1 a Newport cigarette box with two plastic baggies containing white powder-like substance.

17.     Once the transaction was finished, CS-1 got out of the vehicle and saw that SALAMAN was still standing outside. CS-1 left the area and was followed by surveillance units.

---

[3] As noted above, Target Cell Phone 2 was the subject of a prior search warrant issued April 1, 2022, by Judge Spector.

CS-1 was observed on video/audio recording driving from the transaction location with SALAMAN to the pre-determined meet location without any deviations.

18.     Once back at the pre-determined location, Special Agent Kim and Special Agent Daniel Veale debriefed CS-1, who turned over the Newport cigarette box with two plastic baggies containing white powder-like substance over to Special Agent Kim. Additionally, members of the FBI New Haven Safe Streets Task Force searched CS-1 and CS-1's vehicle for other narcotics, money, or contraband immediately before and after the heroin purchase described above, with negative results.

19.     At the FBI New Haven Field Office, Special Agent Veale field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 52.5 grams (including packaging).

20.     The Drug Enforcement Administration Laboratory chemical analysis report indicated that the substance recovered from HEREDIA weighed 50 grams (without packaging) and tested positive for fentanyl and heroin compound.

21.     Members of FBI New Haven Safe Streets Task Force searched Target Cell Phone 2 on the CashApp mobile payment application in an attempt to identify "Junie." A query of Target Cell Phone 2 through CashApp revealed a username "Ismael Heredia." A database check of the name, Ismael Heredia, returned to an Ismael Heredia (date of birth: xx/xx/1992), a resident of New Haven, Connecticut. CS-1 was provided with Ismael Heredia's Department of Motor Vehicle (DMV) picture. CS-1 confirmed that the pictured individual was the "Junie" whom CS-1 had been introduced to during the controlled buy. Investigators corroborated CS-1's

identification of HEREDIA with their own comparison of HEREDIA's DMV photo to images of "Junie" captured during controlled narcotics purchases.

### December 2, 2021 Controlled Narcotics Buy

22.     On or about December 2, 2021, Special Agent Kim, Special Agent Adam Jones, and CS-1 met at a pre-determined location. At the direction of Special Agent Kim, CS-1 called HEREDIA at Target Cell Phone 2. HEREDIA instructed CS-1 to meet at the intersection of Fillmore Street and Clay Street in New Haven, Connecticut to purchase of 50 grams of heroin. The call was recorded, and Special Agent Kim visually observed CS-1 place the call. Special Agent Kim later confirmed that CS-1 had made the call by looking and taking a photograph of CS-1's phone call log. During the call, HEREDIA advised CS-1 that he was ready to conduct the transaction.

23.     Special Agent Kim outfitted CS-1 with a recording equipment and provided CS-1 with government funds to complete the purchase. CS-1, followed by surveillance units, drove to the location provided by HEREDIA. Based on the review of the audio/video recording from CS-1's recording device, Special Agent Kim observed the following: Once at the meet location, CS-1 met with HEREDIA and another Hispanic male who arrived in a black Audi sedan.

24.     HEREDIA sat in the back seat of the black Audi sedan and CS-1 sat in the passenger side of the black Audi sedan. CS-1 handed HEREDIA $2,790 of government funds and was handed three tightly wrapped clear plastic bags of white powder-like substance. Once the transaction was done, CS-1 got out of the black Audi sedan and back to CS-1's vehicle. CS-1 left the area and was followed by surveillance units. CS-1 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any stops.

25.     After the transaction, HEREDIA was observed by surveillance units getting into the passenger seat of the black Audi sedan. The black Audi sedan then left the area. Surveillance units followed the black Audi sedan to 34 Houston Street, New Haven, Connecticut (SALAMAN's residence) where it remained parked. A person from the black Audi sedan was observed going to the rear of 34 Houston Street and entering the building.

26.     CS-1 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any deviations. Once back at the pre-determined location, Special Agent Kim and Special Agent Jones debriefed CS-1, who turned over the three tightly wrapped clear plastic bags of white powder-like substance to Special Agent Kim. Additionally, members of the FBI New Haven Safe Streets Task Force searched CS-1 and CS-1's vehicle for other narcotics, money, or contraband immediately before and after the fentanyl purchase described above, with negative results.

27.     At the FBI New Haven Field Office, Special Agent Jones field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of cocaine with fentanyl compound. The white powder-like substance weighed 57.5 grams (including packaging).

28.     The Drug Enforcement Administration Laboratory chemical analysis report indicated that the substance recovered from HEREDIA weighed 51.9 grams (without packaging) and tested positive for fentanyl and caffeine compound.

**Facebook Message and Phone Call from SALAMAN to CS-1**

29.     On or about December 12, 2021, SALAMAN contacted CS-1 using the his Facebook account "Babeboy.Hood." CS-1 has a history of communicating with SALAMAN through this particular Facebook account. SALAMAN messaged CS-1 "My boy came to see the other day he asked me bout you." "I forgot to hit you he fucks with you bro I told him you my

nigga he can fuck with you like he fucks with me so he gonna be giving you a better number."
CS-1 provided Special Agent Kim with a screenshot of this Facebook conversation.

30.     Immediately after the Facebook conversation, CS-1 spoke to SALAMAN over the phone by calling Target Cell Phone 1. During the phone conversation, SALAMAN advised CS-1 that HEREDIA was willing to sell CS-1 a higher quantity of fentanyl if CS-1wanted it. Based on the training and experience of the FBI investigative team, the discussion between CS-1 and SALAMAN through Facebook was referencing the sale and distribution of narcotics. Phrases such as, "he fucks with you bro" and "he can fuck with you like he fucks with me" are common phrases drug dealers use to state that the parties involved are willing to sell and buy narcotics from each other. The phrase "he gonna be giving you a better number" is also a commonly used terminology for a promise of a higher quantity of illegal drugs. Furthermore, the discussion about the sale of narcotics on Facebook was bolstered by the phone conversation between CS-1 and SALAMAN that took place just after the Facebook conversation.

**December 13, 2021 Controlled Narcotics Buy**

31.     On December 12, 2021, HEREDIA text messaged CS-1 using Target Cell Phone 2 and asked if CS-1wanted the same amount or doubled. CS-1 told HEREDIA to double it, to which HEREDIA agreed. On or about December 13, 2021, Special Agent Daniel Veale and Special Agent Kim met with CS-1 at a predetermined location to provide instructions regarding the controlled purchase. At the directions of Special Agent Kim and Special Agent Veale, CS-1 placed a call to HEREDIA using Target Cell Phone 2. The call was recorded, and Special Agent Kim visually later confirmed that CS-1 made the call by looking and taking a photograph of CS-1's phone call log. HEREDIA instructed CS-1 to meet at a location in New Haven, Connecticut for the purchase of 100 grams of heroin.

32.     Special Agent Kim outfitted CS-1 with a recording equipment and provided CS-1 with government funds to complete the purchase. CS-1, followed by surveillance units, drove to the location provided by HEREDIA. Based on the review of the audio/video recording from CS-1's recording device, Special Agent Kim observed the following: HEREDIA arrived in a gray/blue Honda CR-V displaying Connecticut registration AT11341 (registered to Jessica Quinonez, date of birth: xx/xx/1991). CS-1 got out of CS-1's vehicle and got into the passenger side of HEREDIA's Honda CR-V. While in the CR-V, HEREDIA told CS-1 that he goes to Ohio and New York to sell narcotics as well. HEREDIA told CS-1 that he always has product and never runs out. When getting into HEREDIA's vehicle, CS-1 mentioned to HEREDIA that "Bebe" (identified by investigators as SALAMAN) told CS-1 to contact HEREDIA. CS-1 stated, "Bebe said you called and asked about me and shit so." to which HEREDIA responded "Yeah, yeah".

33.     CS-1 handed HEREDIA $5,000 and in return, HEREDIA handed CS-1 five individually wrapped plastic bags containing white powder-like substance. Once the transaction was done, CS-1 got out of the CR-V and went back to CS-1's vehicle. CS-1 left the area and was followed by surveillance units. CS-1 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any stops.

34.     Once back at the pre-determined location, Special Agent Kim and Special Agent Veale debriefed CS-1, who turned five individually wrapped plastic bags containing white powder-like substance over to Special Agent Kim. Additionally, members of the FBI New Haven Safe Streets Task Force searched CS-1 and CS-1's vehicle for other narcotics, money, or contraband immediately before and after the fentanyl purchase described above, with negative results.

35.     At the FBI New Haven Field Office, Special Agent Jones field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 109 grams including the original packaging it came in.

36.     The Drug Enforcement Administration Laboratory chemical analysis report indicated that the substance recovered from HEREDIA weighed 98.9 grams (without packaging) and tested positive for fentanyl and cocaine compound.

37.     As noted above, on December 16, 2021, a federal search warrant was issued for 30 days of prospective location information collection for Target Cell Phone 1, used by SALAMAN, and Target Cell Phone 2, used by HEREDIA. Case No. 21mj1217 (RAR).

### December 17, 2021 Controlled Narcotics Buy

38.     On or about December 16, 2021, CS-1 spoke with HEREDIA over the phone using Target Cell Phone 2. HEREDIA told CS-1 that he could sell 150 grams of heroin. December 17, 2021, Special Agent Kim and FBI Task Force Officer (TFO) Joel Grispino met with CS-1 at a predetermined location to provide instructions regarding the controlled purchase. At the direction of Special Agent Kim and TFO Grispino, CS-1 placed a call to HEREDIA by calling Target Cell Phone 2. The call was recorded, and Special Agent Kim visually later confirmed that CS-1 made the call by looking at and taking a photograph of CS-1's phone call log. HEREDIA instructed CS-1 to meet at the intersection of Fillmore Street and Clay Street in New Haven, Connecticut for the purchase of heroin.

39.     Special Agent Kim outfitted CS-1 with a recording equipment and provided CS-1 with government funds to complete the purchase. CS-1, followed by surveillance units, drove to

the location provided by HEREDIA. Based on the review of the audio/video recording from CS-1's recording device, Special Agent Kim observed the following:

40.     While CS-1 was parked at the predetermined meet location, HEREDIA told CS-1 that he would be coming in a black Acura SUV with his brother and his brother's wife. Approximately 20 minutes after CS-1 parked, a black Acura MDX with Connecticut registration AV18597 (registered to Aileen Padillia-Diaz, date of birth: xx/xx/1988) parked near CS-1. HEREDIA exited the Acura and got into CS-1's vehicle's passenger side. Inside the vehicle, HEREDIA told CS-1 that he was going to New Jersey tonight to "drop a kilo" (common street terminology for distributing a kilogram of drugs, based on the training and experience of the FBI investigative team). HEREDIA told CS-1 that he usually sells his product for 78 dollars a gram, but because "Bro Bro" (CS-1 knew that HEREDIA was speaking about SALAMAN because the only mutual person they had in common was SALAMAN) vouched for CS-1, he was selling his product for 50 dollars per gram. HEREDIA told CS-1 that he usually drives a small white car to not be flashy, but he does own a Maserati SUV and another sports car. HEREDIA also told CS-1 that he has a lot of jewelry at his house, but he doesn't like to wear it out.

41.     CS-1 handed HEREDIA $7,500 and was given two individually wrapped plastic bags containing white powder-like substance. HEREDIA got out of CS-1's vehicle and went back to the black Acura SUV. The surveillance units observed a male in the driver's seat and a female in the passenger seat. HEREDIA got into the back seat of the black Acura SUV. After the black Acura SUV departed the narcotics transaction location, surveillance units followed the black Acura SUV to 34 Houston Street, New Haven, Connecticut (SALAMAN's residence). HEREDIA got out of the Acura SUV and walked into 34 Houston Street, New Haven, Connecticut.

42.     CS-1 left the area and was followed by surveillance units. CS-1 was observed on video/audio recording driving from the transaction location with HEREDIA back to the pre-determined meet location without any stops.

43.     Once back at the pre-determined location, Special Agent Kim and TFO Grispino debriefed CS-1, who turned over two individually wrapped plastic bags containing white powder-like substance to Special Agent Kim. Additionally, members of the FBI New Haven Safe Streets Task Force searched CS-1 and CS-1's vehicle for other narcotics, money, or contraband immediately before and after the fentanyl purchase described above, with negative results.

44.     At the FBI New Haven Field Office, Special Agent Kim field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 171 grams including the original packaging it came in.

45.     The Drug Enforcement Administration Laboratory chemical analysis report indicated that the substance recovered from HEREDIA weighed 148.8 grams (without packaging) and tested positive for fentanyl.

46.     On or about December 17, 2021, GPS data on both Target Cell Phone 1 and Target Cell Phone 2 was activated. Upon review of the GPS data, at around the time HEREDIA was seen walking into 34 Houston St. New Haven, CT (SALAMAN's residence) after the narcotics transaction with CS-1, Target Cell Phone 1 pinged within approximately 23 meters of 34 Houston St. New Haven, CT (SALAMAN's residence).

**December 21, 2021 Controlled Narcotics Buy**

47.     On or about December 21, 2021, Special Agent Kim and Special Agent Ryan Halpin met with another FBI confidential human source, CS-2, at a predetermined meet location to provide instructions regarding the controlled narcotics purchase from HEREDIA. CS-2 was supposed to be introduced to HEREDIA by CS-1; however, CS-1 was not able to make it to the predetermined meet. CS-1 communicated with HEREDIA using Target Cell Phone 2 and relayed the information to Special Agent Kim. HEREDIA text messaged CS-1 through Target Cell Phone 2 to instruct CS-2 to meet at 129 Fillmore St. New Haven, Connecticut for the narcotics transaction.

48.     Special Agent Kim outfitted CS-2 with recording equipment and provided CS-2 with government funds to complete the purchase. CS-2, followed by surveillance units, drove to 129 Fillmore St. New Haven, CT, per HEREDIA's instructions. Based on the review of the audio/video recording from CS-2's recording device, Special Agent Kim observed the following:

49.     On the way to 129 Fillmore St., Special Agent Kim instructed CS-1 to send HEREDIA CS-2's phone number so they could coordinate the meet location directly. HEREDIA called CS-2 through Target Cell Phone 2. HEREDIA told CS-2 to come to 129 Fillmore St. Once inside Target Premises 2, CS-2 met HEREDIA and three other Hispanic males. One of the Hispanic males took out a clear plastic bag containing six individually wrapped white powder-like substance from his bag and handed it to CS-2.

50.     After CS-2 left the apartment, surveillance units observed three Hispanic males exit Target Premises 2 and get into a white Ford Edge bearing Connecticut registration AW50842 (registered to John Vazquez, date of birth: xx/xx/1963). The Ford Edge went up towards Pierpont Street, New Haven, and parked on the side of the road. A surveillance unit observed HEREDIA and another male get out of the Ford Edge and walk on foot near 34

Houston St. New Haven, Connecticut. The third male stayed in the white Ford Edge and eventually drove off.

51.    CS-2 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any deviations.

52.    At the FBI New Haven Field Office, Special Agent Kim field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 165 grams including the original packaging it came in.

53.    The Drug Enforcement Administration Laboratory chemical analysis report indicated that the substance recovered from HEREDIA weighed 149.7 grams (without packaging) and tested positive for fentanyl and caffeine compound.

54.    During the controlled narcotics transaction on December 17, 2021, GPS data on both Target Cell Phone 1 and Target Cell Phone 2 was active. Around the time HEREDIA was seen near 34 Houston St. New Haven, CT (SALAMAN's residence), Target Cell Phone 1 pinged within approximately 56 meters of 34 Houston Street, New Haven, Connecticut.

**January 6, 2022 Facebook Message and Phone Call from SALAMAN**

55.    On or about January 6, 2022, SALAMAN messaged CS-1 using the his Facebook Account "Babeboy.Hood" and told CS-1 to call him. CS-1 had a 19-minute conversation with SALAMAN through a mobile phone application Text Now, immediately following the Facebook conversation. During the phone conversation, SALAMAN told CS-1 that HEREDIA had given SALAMAN a lot of "product" and that, if CS-1 was looking to buy, SALAMAN would be able to sell to CS-1. Based on the nature of CS-1's relationship with SALAMAN, CS-1 understood

"product" to mean illegal narcotics, and I know from training and experience that drug

traffickers often refer to illegal narcotics as "product."

**January 11, 2022 Controlled Narcotics Buy**

56.     On or about January 11, 2022, Special Agent Kim and Special Agent Adam Jones

met with CS-2 at a predetermined meet location to provide instructions regarding the controlled

narcotics purchase from HEREDIA. On a date prior to this meet, CS-2 exchanged text messages

with Target Cell Phone 2 to confirm the prices of the narcotics that were to be purchased. In the

presence of Special Agent Kim and Special Agent Jones, CS-2 placed a call to HEREDIA by

calling Target Cell Phone 2. The call was recorded, and Special Agent Kim visually later

confirmed that CS-1 made the call by looking at and taking a photograph of CS-1's phone call

log. HEREDIA agreed to meet CS-2 near 80 Fillmore St., New Haven, Connecticut, which is a

block away from 129 Fillmore St., New Haven, CT.

57.     Special Agent Kim outfitted CS-2 with recording equipment and provided CS-2

with government funds to complete the purchase. CS-2, followed by surveillance units, drove to

the location provided by HEREDIA. Based on the review of the audio/video recording from CS-

2's recording device, Special Agent Kim observed the following:

58.     CS-2 arrived at the vicinity of 80 Fillmore St. New Haven, Connecticut and

parked on the side of the road. A silver BMW sedan with Connecticut registration BD56884

parked across the street from where CS-2 was parked. HEREDIA approached CS-2's vehicle and

got in the passenger side. CS-2 handed HEREDIA the government funds. HEREDIA then called

out to the driver of the silver BMW to come over. An unknown Hispanic male exited the silver

BMW and approached CS-2's vehicle by the driver side window. The unknown Hispanic male

handed CS-2 two clear bags containing white powdery substance. Once CS-2 was in possession

of the clear bags, HEREDIA exited the vehicle and both the unknown Hispanic male and

HEREDIA got into the silver BMW and left the area. Surveillance units followed the silver BMW from the narcotics transaction, directly to 34 Houston St., New Haven, Connecticut (SALAMAN's residence). Both HEREDIA and the unknown Hispanic male were observed by the surveillance units getting out of the silver BMW and walking into 34 Houston St. New Haven, CT.

59.     CS-2 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any deviations.

60.     At the FBI New Haven Field Office, Special Agent Jones field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 53 grams including the original packaging it came in.

### March 16, 2022 Controlled Narcotics Buy

61.     On or about March 16, 2022, Special Agent Kim and Special Agent Adam Jones met with CS-2 at a predetermined meet location to provide instructions regarding a controlled narcotics purchase from HEREDIA. In the presence of Special Agent Kim and Special Agent Jones, CS-2 placed a call to HEREDIA by calling Target Cell Phone 2. The call was recorded, and Special Agent Kim visually later confirmed that CS-2 made the call by looking at and taking a photograph of CS-2's phone call log. After the phone call, HEREDIA sent a text message to CS-2 using Target Cell Phone 2 with an address "145 Carlisle St. New Haven, CT."

62.     Special Agent Kim outfitted CS-2 with recording equipment and provided CS-2 with $3,000 in government funds to complete the purchase. CS-2, followed by surveillance units, drove to the location provided by HEREDIA. Based on the review of the audio/video recording from CS-2's recording device and CS-2's debrief, Special Agent Kim observed the following:

63.     CS-2 arrived in the area of 145 Carlisle St., New Haven, Connecticut and parked on the street. As CS-2 was waiting, HEREDIA entered CS-2's vehicle from the passenger side. CS-2 observed two other unknown Hispanic males in the area. One of the unknown Hispanic males got close to CS-2's window while HEREDIA got into the vehicle and the other unknown Hispanic male stayed standing on a porch near the meet location. HEREDIA handed one clear plastic bag with white powder-like substance in exchange for $3,000 in government funds. Once the transaction was over, HEREDIA got out of CS-2's vehicle and walked away. CS-2 was observed on video/audio recording driving from the transaction location with HEREDIA to the pre-determined meet location without any deviations.

64.     At the FBI New Haven Field Office, Special Agent Jones field tested a sample of the white powder-like substance received from HEREDIA with a Thermo Scientific TruNarc device. The sample tested positive for the presumptive presence of heroin with fentanyl compound. The white powder-like substance weighed 51 grams including the original packaging it came in.

### SALAMAN and HEREDIA Additional Contact with CS-1 and CS-2

65.     On or around February 7, 2022, CS-1 received a text message from HEREDIA through Target Cell Phone 2. The text message stated "an u already know in town just checking on my ppls that's why I hit u up." CS-1 believed that HEREDIA was checking on his customers to see if they needed more illegal narcotics.

66.     The next day, CS-1 was contacted by SALAMAN using his Facebook Account "Babeboy.Hood." SALAMAN told CS-1 in a Facebook message "now do 47 for you n ur ppl." CS-1 believed that this meant that SALAMAN was now charging 47 dollars per gram for illegal narcotics for CS-1 and CS-1's associates.

67.     On or around March 2, 2022, CS-2 contacted HEREDIA using Target Cell Phone 2. CS-2 told HEREDIA he had money and was interested in purchasing more illegal drugs. HEREDIA told CS-2 that he had more product and was ready for CS-2 whenever. CS-2 confirmed to investigators that the voice that he heard from the conversation was HEREDIA.

68.     On or around March 10, 2022, SALAMAN again contacted CS-1 using his Facebook Account "Babeboy.Hood." SALAMAN asked CS-1 to call him when CS-1 had time. SALAMAN then called CS-1 through Facebook's video calling feature. During the conversation, SALAMAN told CS-1 that HEREDIA had dropped off approximately two kilograms of "product" for SALAMAN, which SALAMAN needed to sell. SALAMAN told CS-1 that he would be willing to sell one kilogram of "product" to CS-1 for $25,000. CS-1 believed "product" meant heroin with fentanyl compound due their history of selling and buying illegal drugs from each other.

69.     On or around March 21, 2022, SALAMAN once again contacted CS-1 using his Facebook Account Babeboy.Hood. SALAMAN told CS-1 that he needed to ask CS-1 something and attempted an audio call to CS-1 via Facebook. CS-1 called SALAMAN back and had a conversation through Facebook audio. During the conversation, SALAMAN told CS-1 that someone whom SALAMAN had introduced to HEREDIA had complained about the narcotics that person had bought from HEREDIA, and this purchaser was requesting a refund. SALAMAN asked CS-1 if CS-1 had heard any complaints recently about HEREDIA and HEREDIA's products. CS-1 told SALAMAN that CS-1 had not heard any complaints.

70.     On or around March 27, 2022, SALAMAN again messaged CS-1 using his Facebook Account Babeboy.Hood. SALAMAN messaged "Bro do me a big favor  throw a (monkey icon)(wrench icon) in that whole situation with Junie & your man tell him don't fuck

with that nigga no more he bad business to get at me ima have him all the way right and way better numbers Ima end up cashing Junie in he playing a wild game on some sucker shit but do that for me bro give him my number 203 887 4311 [Target Cell Phone 3] tell him to text me b4 he calls bro so I know it's him gd looks bro." CS-1 opined that SALAMAN was referring to the illegal drug transactions when he spoke about doing business.

### Execution of Search Warrant at 34 Houston St. FL 2, New Haven, CT

71.     On April 1, 2022, Judge Spector authorized a search warrant for SALAMAN's residence at 34 Houston St. FL 2, New Haven, CT. Case No. 3:22MJ382 (RMS). The warrant authorized the seizure of, among other things, Target Cell Phone 1, other cell phones, and certain clothing worn by SALAMAN during the November 16, 2021 controlled drug buy.

72.     The search was executed by FBI Special Agents and local police departments on April 5, 2022. During the search, Special Agents located a Blue flat-brimmed hat with the numbers "76" written in white, surrounded by white stars (the logo for the Philadelphia 76ers basketball team), and a black jacket with a Tommy Hilfiger logo displayed on the left breast area of the jacket. The jacket had a zipper with a tag that displayed "HILFIGER" in white lettering along with navy blue, white, and red stripes going vertical in-line with the zipper, and blue shoes with white stripes in one of the bedrooms. The clothing found in this room was consistent with clothing that SALAMAN was wearing during the November 16, 2021 controlled narcotics buy.

73.     Found in the same room as the clothing were small plastic bags (approximately one inch by one inch in size) and a container of yellow wax folds. Based on my training and experience, drug dealers commonly use these types of packaging materials to bundle illegal drugs for distribution purposes. The packaging material was found in a large black plastic bag along with white powder-like substance presumed to be cutting agent. The white powder-like substance was field tested by the FBI and the presumptive test indicated inconclusive. Based on

my training and experience, drug dealers often use cutting agents (such as, but not limited to baking powder and caffeine) to mix in with illegal drugs to increase the weight. A letter addressed to Luis A Salaman was also found in the same room as the clothing and the packaging material.

74.     Along with the clothing, packing material, the cutting agent, and the letter addressed to SALAMAN, Special Agents located Target Cell Phones 3, 4, 5, and 6. Target Cell Phones 3, 4, and 5 were found in a black bag and Target Cell Phone 6 was found inside a back box. Investigators called 203-887-4311 (the number SALAMAN had provided CS-1 via Facebook message on March 27, 2022) and observed Target Cell Phone 3 receive the call.

### Additional Information About the Target Cell Phones

75.     As the affidavit in support of the 34 Houston Street search warrant explained, in my training and experience, it is common for drug traffickers to use multiple phones, and to "drop" or "change" their cellular phones, in part to attempt to evade detection by law enforcement, but that drug traffickers who discontinue use of a particular phone will often keep that phone in a secure location in order to maintain records of customer phone numbers and historical communications (for example, preserved text messages). I believe that is what Target Cell Phones 3-6 found at 34 Houston Street represent. Indeed, Target Cell Phone 3 uses the phone number that SALAMAN provided as a drug contact number to CS-1 just over a week prior to the search.

76.     Additionally, based upon my training and experience, I am familiar with the manner and means employed by narcotics traffickers, including the manner and means by which narcotics traffickers communicate, and those methods employed by narcotics traffickers to avoid detection by law enforcement.

77.     From my training and experience, I know that narcotics traffickers often use wireless telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that by doing so they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs, guns and/or other assets. I also know that such individuals often frequently "drop" or "change" their cellular telephones, i.e. terminate usage of one cellular telephone and begin usage of a new cellular telephone, in an attempt to thwart the efforts of law enforcement, and often possess and use multiple cellular telephones interchangeably for the same reason. Furthermore, I know that drug traffickers and the couriers and transporters that work for sources of supply often compartmentalize operations by using different phones to communicate with different re-distributors so that if one part of the distribution operation is compromised by law enforcement, other aspects of the operation remain intact. The use of multiple cell phones at the same time is one way to achieve such compartmentalization. I and other law enforcement officers that I have work within drug investigations have had the opportunity to obtain search warrants for cell phones in the past. The execution of these search warrants has resulted in the recovery of, among things, text messages, photographs, WhatsApp messages, Facebook messages, and phone contacts that have constituted evidence of drug trafficking. Indeed, here, investigators have observed SALAMAN using Facebook to discuss drug trafficking, and investigators know through records obtained from Facebook that SALAMAN has been accessing Facebook with a mobile device.

78.     From my training and experience, I also know from the makes and models of the Target Cell Phones that they retain data including, but not limited to, Bluetooth data, Wi-Fi connectivity data, contacts, text messages, voicemails, and GPS location data. There is probable cause to believe, and I do believe, that location information stored on the Target Cell Phones

may reveal the location of co-conspirators, stash house locations, and a pattern of life of participants in the drug trafficking activity being investigated here.

79.     Based on my training and experience and discussions with other investigators, it is known that persons who smuggle and transport illegal narcotics frequently use cell phones to maintain contact with co-conspirators during travel and also use cell phones to contact persons where the drugs are destined. This frequently occurs due to the transient nature of these smuggling operations and because members of these conspiracies frequently travel and require coordination of their movements in order to pick up and drop off drugs at designated times and places.

**Electronic Devices Searches**

80.     Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

a.  the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

b.  call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

c.  descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

d.  records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.   saved searches, locations, and route history in the memory of said device/s; and

h.   internet browsing history, to include, internet searches in the memory of said devices.

## Electronic Storage and Forensic Analysis

81.     The warrants applied for to search the Target Cell Phones would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

82.     Based upon my training and experience, and in consultation with other law enforcement officers, I know that cellular telephones store voice mail messages, names, telephone numbers, addresses, sent and received text messages and images on their digital memory. Some devices also store location data, showing where the phone has traveled, and also contain third party applications that store additional communications. Further, often the only way to recover information and communications from third party applications is by recovering data stored on the cell phones.

83.     The applied-for warrants would authorize the forensic examination of the Target Cell Phones, including access to all internal applications within those cell phones, for the purposes of identifying electronically stored data particularly described in Attachments B-1—B-4.

84.     A thorough search of digital media, such as cell phones, for evidence of a crime commonly requires a qualified expert to conduct the search. This is true for the following reasons:

a. Searching digital media is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with personnel who have specific expertise in the type of digital media that is being searched.

b. Searching digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential in conducting a complete and accurate analysis of the equipment and storage device from which the data can be extracted.

85.     I know through training and experience that a modern cellular telephone handset stores data relating to the device's usage. This data includes call logs, calls received, stored telephone numbers, text messaging, email messages, video files, image files, and audio files. Moreover, this data, even if untouched for a long time or deleted, may be retrievable through forensic examinations conducted by qualified personnel.

86.     A cellular telephone has become a virtual recorder of a person's daily activities. Data within a cellular telephone can log identifiers regarding calls made and received as well as when these conversations occurred. The data may include information that includes call logs, pictures, and a contact list of known acquaintances or coconspirators. Due to this potential of data, a cellular telephone has become an indispensable piece of evidence in criminal investigations.

87.     Furthermore, the data contained within cellular telephones is, and can be, useful in identifying the actual owner of the telephone as well as who may have been using the telephone by examining the calls or messages sent, received, or missed. Further, the data contained within the device is useful to investigators in that it may show communication between

a victim, a suspect, and other coconspirators or other potential valuable witnesses prior to, during, or after the time of the crime or incident.

88.     Based on my training and experience, I know that modern cell phones have different capabilities that allow them to serve as cellular devices, cameras and video recorders, portable media players, and GPS navigation devices. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, as well as evidence relating to co-conspirators with whom the user of the device was in contact.

89.     Furthermore, based on my training and experience, I know that internet-browsing history in cellular telephones can contain evidence of email communications between co-conspirators and internet searches for locations and addresses utilized to meet and discuss criminal activity. Cellular telephones may also contain videos and images of co-conspirators; possible locations used to discuss criminal activity (e.g., acquiring or selling narcotics), such as residences and businesses; as well as conveyances used during criminal activity, such as automobiles. Specifically, based on my training and experience, I know the following information tends to exist on cellular telephones, including devices used by those involved in illegal narcotics trafficking:

       a.   the telephone number, ESN number, serial number, and SIM card number of said telephone;

       b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

       c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

       d.   any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or

photograph of any person, telephone books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, location data, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said devices;

h.  internet browsing history, to include, internet searches in the memory of said device; and

i.  Images and videos in the memory of said device.

90.     In searching for evidence, fruits, and instrumentalities of criminal activity within the Target Cell Phones, as set forth herein, the Government will employ the following procedures:

a.  The cell phone(s) will be provided to the appropriate law enforcement personnel for review to determine whether the contents of the cell phone(s) contain evidence and instrumentalities of violations of federal law.

b.  The cell phone(s) and the contents thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence related to the Target Offenses.

91.     I also request that the Court authorize the retrieval of the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device. I am aware that in some cases the software or equipment necessary to analyze cellular devices in this manner is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant.

92.     It is also requested that the warrants be deemed executed once the cell phones have been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

93.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the Target Cell Phones consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

94.     Searching for the evidence described in Attachments B-1—B-4 may require a range of data analysis techniques. In some cases, agents and analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachments B-1—B-4, or perusing all stored information briefly to determine whether it falls within the scope of the warrants. In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachments B-1—B-4.

## AUTHORIZATION REQUESTS

95.     Based on the foregoing, I request that the Court issue the proposed search warrants.

96.     Because the Target Cell Phones are already in law enforcement custody, I submit

that there is good cause for authorizing the requested search to take place at any time of day or

night.

Respectfully submitted,

_____
TAE KIM
SPECIAL AGENT, FBI

Subscribed and sworn to me by telephone
on April ___, 2022 in Hartford, Connecticut.

_____
HON. ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A-1</u>

**Property To Be Searched**

The following cellular device in the custody of the FBI in New Haven, Connecticut:

a.     A black Samsung model A32 cellular device assigned call number 203-887-4311 and assigned International Mobile Equipment Identity (IMEI) 355820494158936 ("Target Cell Phone 3").

## ATTACHMENT B-1

### Particular Things to be Seized

All records and information evidencing drug trafficking offenses in violation of Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further Drug Trafficking), to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## ATTACHMENT A-2

### Property To Be Searched

The following cellular device in the custody of the FBI in New Haven, Connecticut:

 a.  A blue and black Motorola model XT2093DL cellular device with IMEI 355568113859380 ("Target Cell Phone 4").

**ATTACHMENT B-2**

**Particular Things to be Seized**

All records and information evidencing drug trafficking offenses in violation of Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further Drug Trafficking), to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**<u>ATTACHMENT A-3</u>**

**Property To Be Searched**

The following cellular devices in the custody of the FBI in New Haven, Connecticut:

      a.     A black Samsung model A12 cellular device assigned IMEI 357486356039123 ("Target Cell Phone 5").

## ATTACHMENT B-3

### Particular Things to be Seized

All records and information evidencing drug trafficking offenses in violation of Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further Drug Trafficking), to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**ATTACHMENT A-4**

**Property To Be Searched**

The following cellular device in the custody of the FBI in New Haven, Connecticut:

     a.      A blue and black Motorola model XT2093-3 cellular device IMEI 351647114380721 ("Target Cell Phone 6").

10

## ATTACHMENT B-4

### Particular Things to be Seized

All records and information evidencing drug trafficking offenses in violation of Title 21, United States Code, Sections 841(a)(1), 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances), and 843(b) (Use of a Communications Facility to Further Drug Trafficking), to include the following, as they relate to the above-listed offenses:

1. the telephone number, ESN number, serial number, and SIM card number of the telephone;

2. the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of the telephone;

3. descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, violations of 21 U.S.C. §§ 841(a)(1) and 846 and 843;

4. any and all records, however created or stored, which tend to demonstrate ownership and use of the device/s, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the telephone;

5. any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the telephone, such as passwords, sign-on codes, and program design;

6. GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

7. saved searches, locations, and route history in the memory of said telephone;

8. internet browsing history, to include, internet searches in the memory of the telephone;

9. images and videos in the memory of the telephone; and,

10. evidence of user attribution showing who used or owned the telephone at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

It is specifically authorized that stored electronic information, data, information and images contained in the above-described telephone may be reproduced by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device(s).

To the extent that the telephone contains removable storage media and/or other devices, examination of such removable media and/or devices is specifically authorized for the same evidence as described in this attachment.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.